UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NICOLLE BESUDEN,<br><br>                    Plaintiff,<br>vs.<br><br>The City of New York, Mayor Bill de Blasio, NYPD Commissioner Dermot Shea, NYPD Chief of Department Terence Monahan, Lieutenant Michele Irizarry, Captain O'Hare, NYPD Deputy Inspector Elias J. Nikkas, NYPD Captain Julio Delgado, NYPD Captain Michael John, Police Officer Yu Jian, Police Officer John Doe, Police Officer Patrick Connolly, Police Officer Cardenas, Police Officer Edward Casaceli and Police Officers John Does #1-13,<br><br>                    Defendants. | Civil Case No. 21-cv-08452<br>Jury Demand<br><br>**FIRST AMENDED<br>COMPLAINT AND<br>DEMAND FOR<br>JURY TRIAL** |

Plaintiff, NICOLLE BESUDEN, ("BESUDEN" and "Plaintiff") by and through her attorneys, The Aboushi Law Firm, PLLC, complaining of the Defendants, respectfully alleges as follows:

**PRELIMINARY STATEMENT**

1. Throughout 2020, Plaintiff attended several protests in New York City. Each time Plaintiff attended a protest, she was singled out by police officers by name, harassed, intimated, assaulted and falsely arrested. Plaintiff was also surveilled and targeted by the NYPD during times when she was not participating in protests. Plaintiff now brings this action for violations of her rights under the federal and state constitutions and state common law

**JURISDICTION AND VENUE**

2. This Court has federal question jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3).

3. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

4. Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2) as at least one of the Defendants resides in this district and a substantial part of the events and/or omissions were committed in this district.

5. Plaintiffs assert the following claims pursuant to the United States Constitution, New York Constitution, Section 42 U.S.C.§ 1983, New York State law, as well as common law.

6. Plaintiff has complied with all requirements for asserting her claims, including filing a notice of claim, thirty days having elapsed since presentation of the claim, and compliance with GML Section 50 and the relevant subsections.

## THE PARTIES

7. The Plaintiff Nicolle Besuden is a resident of the City of New York.

8. Defendant City of New York was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York.

9. Defendant City of New York maintains the New York City Police Department ("NYPD"), a duly authorized public authority and/or police department, authorized to perform all functions of a police department as per the applicable sections of the New York State Criminal Procedure Law, acting under the direction and supervision of the aforementioned municipal corporation, City of New York.

10. Defendant New York City Mayor Bill de Blasio was at all times relevant to this Complaint, and still is, the Mayor of New York City. As Mayor, Defendant DeBlasio, at all relevant times, was and is an elected official and the chief executive officer of the city pursuant to NYC charter section 3 and had final authority to appoint and or remove the NYPD Police Commissioner.

11. Defendant NYPD Commissioner Dermot Shea was at all times relevant to this Complaint was the Police Commissioner of the NYPD. As Police Commissioner, Defendant Shea, personally and/or through his authorized delegates, at all relevant times had final authority to promulgate and implement administrative and managerial policies and procedures, including policies and procedures as to personnel hiring, training, supervision, and discipline with respect to NYPD officers' performance of their duties, and constituted a City policymaker for whom the City is liable. He is sued individually and in his official capacity.

12. Defendant NYPD Chief of Department Terence Monahan was at all times relevant to this Complaint the Chief of Department of the NYPD who has policymaking authority over the Department. At all relevant times, as Chief of Department, Defendant Monahan, had primary responsibility for NYPD operations—that is, for the police response on the street. Within the paramilitary structure of the NYPD, all NYPD uniformed members of the service were obligated to obey any lawful order given by him. He is sued individually and in his official capacity.

13. Defendant NYPD Lieutenant Michele Irizarry is a resident of New York, an agent for the NYPD and City of New York, and at all times was acting within her official capacity as a Lieutenant, in uniform, while displaying a gun and a badge. Defendant Lt. Irizarry took action as a supervisor and NYPD uniformed members of the service were obligated to obey any lawful order given by her. She is sued individually and in her official capacity.

14. Defendant NYPD Deputy Inspector Elias Nikkas is a resident of New York, an agent for the NYPD and City of New York, and at all times was acting within his official capacity as Deputy Inspector in uniform, while displaying a gun and a badge. Defendant Deputy Inspector Nikkas took action as a supervisor and NYPD uniformed members of the service were obligated to obey any lawful order given by him. He is sued individually and in his official capacity.

15. Defendant NYPD Captain O'Hare is a resident of New York, an agent for the NYPD and City of New York, and at all times was acting within his official capacity as a Captain, in uniform, while displaying a gun and a badge. Defendant Captain O'Hare took action as a supervisor and NYPD uniformed members of the service were obligated to obey any lawful order given by him. He is sued individually and in his official capacity.

16. Defendant NYPD Captain Julio Delgado is a resident of New York, an agent for the NYPD and City of New York, and at all times was acting within his official capacity as a Captain, in uniform, while displaying a gun and a badge. Defendant Captain Delgado took action as a supervisor and NYPD uniformed members of the service were obligated to obey any lawful order given by him. He is sued individually and in his official capacity.

17. Defendant NYPD Captain Michael John is a resident of New York, an agent for the NYPD and City of New York, and at all times was acting within his official capacity as a Captain, in uniform, while displaying a gun and a badge. Defendant Captain Michael John took action as a supervisor and NYPD uniformed members of the service were obligated to obey any lawful order given by him. He is sued individually and in his official capacity.

18. Defendant NYPD Police Officer Cardenas is a resident of New York, an agent for the NYPD and City of New York, and at all times was acting within his official capacity as a police officer, including but not limited to, taking action as a police officer, in uniform, while displaying a gun and a badge. He is sued individually and in his official capacity.

19. Defendant NYPD Police Officer Yu Jian is a resident of New York, an agent for the NYPD and City of New York, and at all times was acting within his official capacity as a police officer, including but not limited to, taking action as a police officer, in uniform, while displaying a gun and a badge. He is sued individually and in his official capacity.

20. Defendant NYPD Police Officer Patrick Connolly is a resident of New York, an agent for the NYPD and City of New York, and at all times was acting within his official capacity as a police officer, including but not limited to, taking action as a police officer, in uniform, while displaying a gun and a badge. He is sued individually and in his official capacity.

21. Defendant NYPD Police Officer Edward Casaceli is a resident of New York, an agent for the NYPD and City of New York, and at all times was acting within his official capacity as a police officer, including but not limited to, taking action as a police officer, in uniform, while displaying a gun and a badge. He is sued individually and in his official capacity.

22. That at all times hereinafter mentioned, the Defendant New York City Police Officers "John Does 1-13" (collectively, "Defendant 'John Doe' Police Officers" or "Defendant Officers"), were duly sworn Police Officers of said department and were acting under the supervision of said department and according to their official duties. They are sued individually and in their official capacities.

23. That at all times relevant to this action, the Defendant New York City Police Officers "John Does 1-13", either personally or through their employees, were acting under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the State or City of New York.

## FACTUAL ALLEGATIONS

**1.  July 24, 2020.**

24. On July 24th, 2020, Plaintiff attended a march for Black Queer and Trans Lives that ended at Foley Square in New York, New York.

25. Numerous Police officers began shoving and kettling protestors together, including Plaintiff. The officers then ran at Plaintiff and other protestors and hit them with batons. Defendant Police Officer John Does 1 and 2 hit Plaintiff multiple times as they swung indiscriminately at the kettled crowd causing people to fall and be stomped on while they were unable to leave.

26. While Plaintiff tried to assist a woman who had fallen down and was caught under a bicycle, Defendant Police Officer John Doe 2 ran over to Plaintiff from the far side of the street and used an over-head swing of his baton on Plaintiff's outstretched right arm.

27. As Plaintiff tried to run away while holding her elbow, Defendant Police Officer John Doe 2 struck Plaintiff again over her left shoulder. As a result of the assault, Plaintiff suffered a fractured elbow.

**2.  July 28, 2020**

28. On July 28th, 2020, Plaintiff was at a protest in response to NYPD clearing out the Occupy City Hall encampment. Officers of the Strategic Response Group ("SRG") were mounted on bikes and forced protestors into Madison Square Park. Plaintiff and other protestors were given orders to disperse and get on the sidewalk. Plaintiff complied and got onto the sidewalk.

29. Defendant Nikkas pushed Plaintiff into the street and directed another officer to arrest Plaintiff. Plaintiff was falsely arrested and all charges relating to this arrest were dismissed.

### 3. July 30, 2020

30. On July 30th, 2020, Plaintiff was walking through Foley Square on her way to meet a friend and Defendant Nikkas came up to Plaintiff and asked her how was the beach. Defendant Nikkas' rhetorical question was in reference to a picture Plaintiff posted on her personal Instagram account earlier in the day of her and her friends at the beach.

31. Defendant Nikkas wanted to ensure Plaintiff knew that she was under surveillance by the NYPD and intended to cause fear, intimidation and emotional distress to Plaintiff. Plaintiff did in fact suffer fear, intimidation and emotional threat as a result of Defendant Nikkas' actions.

### 4. August 11, 2020

32. While Plaintiff was hanging out in Washington Square Park, Defendant Captain O'Hare approached Plaintiff on his own accord and said "time to go Nicky" then walked away. Plaintiff had never seen or interacted with Defendant O'Hare before August 11, 2020.

33. Defendant O'Hare wanted Plaintiff to know she was being surveilled by the NYPD and intended to cause fear, intimidation and emotional distress to Plaintiff. Plaintiff did in fact suffer fear, intimidation and emotional threat as a result of Defendant O'Hare's actions.

### 5. September 29, 2020

34. On September 29, 2020, Plaintiff was peacefully protesting in front of Governor Cuomo's Manhattan office located at 633 Third Avenue, New York, NY 10017, when Defendant Police Officer John Doe 3 asked the protestors to clear the area around 11:00 p.m.

35. Plaintiff prepared herself to leave and before she could, Defendant Police Officer John Doe 3 put Plaintiff in a headlock with his baton and dragged her down to the ground. As said officer was choking Plaintiff, approximately four (4) other officers, Defendant Police Officer John Does 4, 5, 6, and 7, jumped on Plaintiff, threw her to the ground and laid on top of her for several minutes.

36. Plaintiff screamed many times that she could not breathe and was in pain.  Defendant Police Officer John Doe 4 put his knee in Plaintiff's back and rested his entire weight on Plaintiff. Defendant Police Officer John Doe 5 rested his weight and his knee on Plaintiff's leg. After keeping Plaintiff in a compromising and painful position for several minutes, she was lifted off of the ground and carried into a police van.

37. Plaintiff was arrested and held for over 23 hours and arraigned on assault charges. All charges pertaining to this arrest were resolved in Plaintiff's favor and were dismissed.

**6.  October 5, 2020**

38. On October 5th, 2020, Plaintiff was attending a March for Jonathan Price, a Black man who was shot 4 times in the stomach by Texas police and died. As the protestors departed the Seaport, in lower Manhattan, Defendant Lieutenant Michele Irizarry approached Plaintiff and asked, "Hi Nicolle, having a good night?"

8

39. Plaintiff asked Defendant Irizarry how she knew her name and if she was trying to intimidate Plaintiff. Defendant Irizarry replied, "Everyone knows your fucking name." Defendant Irizarry intended to cause fear, intimidation and emotional distress to Plaintiff. Plaintiff did in fact suffer fear, intimidation and emotional threat as a result of Defendant Irizarry' actions

40. During the same protest and while Plaintiff was standing on the sidewalk filming an arrest, Defendant Irizarry ripped Plaintiff off the sidewalk by her hair, dragged Plaintiff into the street then arrested Plaintiff. Plaintiff was held for several hours and was issued criminal summonses. All charges pertaining to this arrest were resolved in Plaintiff's favor and were dismissed.

**7. October 17, 2020**

41. On October 17, 2020, Plaintiff attended a march for Breonna Taylor that began at Washington Square Park and met with the march for Trans Rights near Foley Square.

42. Defendant Captain Julio Delgado of the Strategic Response Group was present at the protest smoking a cigar. Plaintiff pointed out that the cigar was not compliant with code and asked him why he was smoking a cigar. Defendant Delgado pointed to another officer and told him to arrest Plaintiff in retaliation, despite the fact that she was lawfully present at the location.

43. Defendant Delgado continued to harass and threaten Plaintiff and directed other officers to harass and threaten Plaintiff, until she was forced to leave the protest. Plaintiff did in fact leave the protest in fear of being assaulted and falsely arrested.

**8. October 26, 2020**

44. Plaintiff was peacefully protesting in Times Square when Defendant Police Officer John Does 8, 9, 10 and 11 pulled Plaintiff off the sidewalk and forced her down to her knees. Defendant Police Officer Yu Jian and Defendant Police Officer John Doe 8 dragged Plaintiff while she was on her knees, forced Plaintiff on her stomach and arrested her.

45. Plaintiff was taken to a precinct for processing and when she entered, officers at the precinct desk said, "Welcome, Nicky," letting her know they all knew who she was although she had never seen them prior to October 26, 2020. Said officers intended to cause fear, intimidation and emotional distress to Plaintiff. Plaintiff did in fact suffer fear, intimidation and emotional threat as a result of their actions.

46. While Plaintiff was being transported to the precinct for arrest processing, the transporting officer said: "We all loved your video of Delgado smoking the cigar," Thereby informing Plaintiff that she was in fact being surveilled, targeted and harassed by NYPD officers. Said officer intended to cause fear, intimidation and emotional distress to Plaintiff and did in fact cause said injuries to Plaintiff.

**9. November 17, 2020**

47. While Plaintiff was attending a protest in Brooklyn Borough Hall, Police Officer Edward Casaceli made it a point to approach Plaintiff and call her by her name. Plaintiff asked how he knew her name and what she looked like to which he responded, "every officer knows your fucking name; your picture is on all of our desks."

**10. December 11, 2020**

48. Plaintiff was lawfully attending a protest near the United Nation Building, on or around 39th Street and Second Avenue, in support of abolishing Immigration and Customs Enforcement ("ICE").

49. During the protest, a woman drove her car through the protestors injuring several people, one of whom was an acquaintance of Plaintiff. While Plaintiff was resting an ice pack on the acquaintance's leg, without basis or cause, Defendant Police Officer John Does 12 and 13 ran up to Plaintiff from behind and tackled her to the ground. The officers then arrested Plaintiff

by placing her hands in zip ties, dragged her for approximately one block and placed her in a police van.

50. Police Officers ridiculed, taunted and mocked Plaintiff while waiting in the van with her. One officer stated, "if you don't want to get run over then don't go out protesting." Plaintiff was crying and the officers mocked how she was crying.

51. The NYPD then doxed Plaintiff and released her full name and home address to the New York Post and told false statements to multiple news outlets claiming that Plaintiff was arrested for interfering with ambulance workers at the scene. These false statements were repeated by many news outlets and online publications.

52. Plaintiff was held for several hours and charged with Obstructing Governmental Administration. All charges pertaining to this arrest were resolved in Plaintiff's favor and were dismissed.

53. Despite having all charges dropped in connection to the arrest on this date, Plaintiff continues to have difficulty in having all the online publications remove her name and contact information.

54. Defendants have made it clear that they are purposefully surveilling, intimidating, targeting, harassing, assaulting and falsely arresting Plaintiff because she exercises her First Amendment rights, particularly when she participates in protests against police brutality.

55. Defendants' willful disregard for Plaintiff's rights is a result of policies, practice, customs, and procedures that enable excessive force, intimidation, false arrests and are aimed at inhibiting lawful protests.

56. Defendants' conduct had the desired effect of chilling and inhibiting Plaintiff from exercising her right to protest.

57. Defendants' intentionally targeted Plaintiff to cause her emotional distress by approaching her in public while she was not participating in protests and making their presence and knowledge of her known to her.

58. Defendants' intentionally targeted Plaintiff to cause her emotional distress by singling her out at protest and harassing, intimidating, and unlawfully arresting her. Defendants further submitted false documents in support of the criminal prosecutions of Plaintiff while providing false statements to the media.

59. In furtherance of the unlawful arrest of Plaintiff, Defendant Police officers falsified criminal charges, summonses and arrest paperwork to justify the false arrests as the charges against Plaintiff were ultimately dismissed.

60. On several occasions mentioned above, Plaintiff tried to comply with a dispersal order and tried to leave but was unable to because Defendant Officers kettled her with other protestors.

61. On several occasions mentioned above, Plaintiff was tackled to the ground by Defendant-Officers, causing her to hit her head and suffer bruises and cuts to her elbows, knees and shins.

62. On several occasions mentioned above, Plaintiff was arrested with flex-cuff zip-ties that were overly tightened to the point where Plaintiff lost mobility in her hands and had continued numbness.

63. Each time Plaintiff was arrested, she complained to the arresting officers and other NYPD officers, including those transporting her, about the tightness of the cuffs and her inability to social distance from other arrestees, only for said officers to completely disregard her complaints, and/or laugh at her.

64. Plaintiff is terrified of police and is afraid to attend protests because she fears she will be assaulted and unlawfully arrested.

65. Plaintiff lives in fear, anxiety and distress because she is targeted, known and surveilled by the NYPD.

66. Plaintiff suffered fear and apprehension as a result of the Defendants' actions and said conduct caused her great alarm and fear for her personal safety, fear of injury and death.

67. Plaintiff's injuries include severe permanent emotional, physical and psychological trauma and injury.

68. As a result of the foregoing, Plaintiff Nicolle Besuden sustained, *inter alia*, physical and mental injuries, emotional distress, embarrassment, deprivation of property, humiliation, and deprivation of her constitutional rights.

**NYPD's Violent Response to Policing Protest in 2020**

69.  On March 13, 2020, Louisville police entered the home of Breonna Taylor, a Black woman and her boyfriend. The Louisville police shot Breonna at least eight times and killed her. They also shot her boyfriend then attempted to criminally charge him for the entire encounter.

70. A few months later, on May 25, 2020, multiple civilians recorded Minneapolis police officer Derek Chauvin and three other officers kill George Floyd, a Black male accused of tendering a $20 counterfeit bill. Chauvin rested his knee, and his entire weight on George Floyd's neck for 9 minutes and 29 seconds until Chauvin choked Mr. Floyd to death.

71. The death of Breonna Taylor set off nationwide protests against police brutality and in support of police accountability in pursuit of racial justice. As tensions were high and daily protests continued, George Floyd was murdered. These murders set off powerful waves of protest across the world demanding police be held accountable and that the police killings of Black people stop.

72. Immediately after the murder of George Floyd, multiple protests were announced and advertised throughout New York City for months and New York residents participated in the said Protests, some of which were held under the Black Lives Matter movement, which condemns systemic racism, anti-Black police violence, and use of excessive force against unarmed Black people.

73. In response to these racial justice and police accountability protest, the NYPD was permitted, encouraged and authorized to use violent, unconstitutional and unlawful measures to interfere, stop and prevent protest regarding police accountability.

74. Defendants knowingly and purposefully used types and levels of force that were excessive and unnecessary against Plaintiff and other peaceful protestors, despite such levels of force being in contravention of, or inconsistent with, NYPD policies and/or training.

75. Upon information and belief, the NYPD does not have training or policies regarding policing protests and First Amendment activity. Instead, the NYPD relied upon the Disorder Control Guidelines ("DCG"), which is a policy governing civil unrest, riots and disorder control.

76. The DCG relies upon militaristic tactics designed to demoralize, disperse and deter groups.

77. The NYPD uses excessive and unlawful force against protestors, including Plaintiff as a result of a policy, custom and practice aimed at inhibiting lawful protests and encouraging the use of excessive force, particularly protest against police misconduct.

78. On June 17, 18, and 22 of 2020, New York State Attorney General Letitia James held hearings about the New York City Police Department's Response to Demonstrations wherein she found police officers "using excessive force against protesters, including use of batons and indiscriminate use of pepper, brandishing firearms at protesters, and pushing vehicles or bikes into protesters."[1]

79. The Department of Investigation ("DOI") also conducted its own investigation and issued a report in response to the NYPD's response to the racial justice protest. [2]

80. The DOI's review of NYPD policies revealed that the NYPD did not have a policy specific to policing protests or First Amendment-protected expression. Rather, the NYPD Patrol Guide covers demonstrations in policies related to policing of "special events," such as parades; "emergency incidents," such as civil disorder; or "unusual disorder," such as riots. [3]

81. The DOI also found that "the force required to carry out a mass arrest was disproportionate to the identified threat," and "placed the burden of potential crime on a wide swath of people who had no apparent connection to that potential criminal activity." [4]

82. Indeed, the NYPD has responded to protests by using unlawful force and false arrests as a matter of policy and practice and has done so on many occasions throughout the years as issues of police brutality rose to unconscionable levels.

---

[1] New York State Office of the Attorney General, *Preliminary Report on the New York City Police Department's Response to the Demonstrations Following the Death of George Floyd* (July 2020) https://ag.ny.gov/sites/default/files/2020-nypd-report.pdf

[2] The City of New York Department of Investigation, *Investigation into NYPD Response to the George Floyd Protests* (December 2020) https://www1.nyc.gov/assets/doi/reports/pdf/2020/DOIRpt.NYPD%20Reponse.%20GeorgeFloyd%20Protests.12.18.2020.pdf

[3] Id at 35.

[4] Id at 56.

83. Defendants knew that NYPD Officers would encounter protests against police brutality and in support of racial justice as multiple protests were announced and advertised throughout New York City for months.

84. Defendants knew that NYPD Officers would encounter protests in response to Police killings of unarmed Black people because they have encountered protest in the past including:

i.   In 2014, the killing of Michael Brown, an unarmed 18-year-old Black man by a Police Officer in Ferguson, Missouri[5];

ii.  In 2014, Eric Garner was choked to death by an NYPD officer in Staten Island, New York[6];

iii. In 2014, Akai Gurley was shot to death by an NYPD officer in Brooklyn, New York[7];

iv.  2015 the killing of Freddie Gray, an unarmed 25-year-old Black man, who died after being injured while in custody of Baltimore Police[8];

v.   2016, Alton Sterling a 37-year-old Black man, was shot dead at close range by two Baton Rouge Police Department officers[9];

---

[5] Mosendz, Polly, *Michael Brown Protests Spread to Times Square* (August 2014) https://www.theatlantic.com/national/archive/2014/08/michael-brown-protests-spread-to-times-square/376125/

[6] The Guardian, *Eric Garner protests continue in cities across America through second night* (December 2014) https://www.theguardian.com/us-news/2014/dec/05/eric-garner-case-new-york-protests-continue-through-second-night

[7] Ransom, Jan and Schapiro, Rich, *Hundreds of protesters march in Brooklyn demanding justice for Akai Gurley* (December 2014) https://www.nydailynews.com/new-york/brooklyn/hundreds-march-brooklyn-demanding-justice-akai-gurley-article-1.2058434

[8] The New York Times, *Over 140 Arrested as New Yorkers Protest the Death of Freddie Gray* (April 2015) https://www.nytimes.com/2015/04/30/nyregion/hundreds-march-in-manhattan-to-protest-the-death-of-freddie-gray.html

[9] George, Michael, Holt, Stefan and Santia, Marc, *At least 40 Arrested as New Yorkers Protest Deadly Police Shootings* (July 2016) https://www.nbcnewyork.com/news/local/new-york-city-new-jersey-protests-deadly-police-shootings-philando-castile-alton-sterling/697693/

vi.    2016, Philando Castille was shot to death by Minneapolis Police, while in the passenger seat of his car while is fiancé was in the driver's seat and his 4-year-old daughter was in the back seat[10].

85. Defendants had notice, by way of media, social media, reports by the Civilian Complaint Review Board, Department of Investigation and others, that NYPD Officers engaged in unlawful behavior against protestors in the past using excessive force, crowd disruption tactics and arrests lacking probable cause.

86. Defendants knew that without intervention or sufficient training, NYPD Officers would again continue to use the same tactics. Nevertheless, Defendants knowingly deployed thousands of insufficiently trained NYPD Officers to police the Protests.

87. There have been numerous documented incidents in the last several months where, as here, the NYPD responded to peaceful protests by using excessive/unlawful force and arresting peaceful protesters.[11]

88. Defendants City and NYPD have been the subject of hundreds of federal and state lawsuits and complaints alleging violations of individuals constitutional rights as a result of and failure to train and the policy and/or practice of condoning violations of constitutional rights, including that of Plaintiff's, by its police officers against protestors including: (1) failure to ensure the need for individualized probable cause for each arrest; (2) failure to provide training regarding policing protests and First Amendment activities; (3) failure to provide meaningful

---

[10] Epstein, Emily Anne, *A week of Bloodshed in America* (July 2016) https://www.theatlantic.com/photo/2016/07/A-Week-of-bloodshed-in-America/490517/

[11] See Legal Aid NYC, *Complaint against the City of New York* (September 2020) https://legalaidnyc.org/wp-content/uploads/2020/10/ECF-1-Complaint-against-the-City-of-New-York-2020-10-26.pdf and Human Rights Watch, *New York Police Planned Assault of Bronx Protestors* (September 2020) https://www.hrw.org/news/2020/09/30/us-new-york-police-planned-assault-bronx-protesters

dispersal orders and opportunities to disperse; and (4) failure to hold officers accountable for misconduct.

89. After an NYPD truck drove into a crowd of protesters, former Mayor de Blasio stated on May 30, 2020, "I do believe the NYPD has acted appropriately."[12]

90. As police officers kettled, assaulted and falsely arrested protestors on live television, on May 31, 2020, Commissioner Shea tweeted, "In no small way, I want you to know that I'm extremely proud of the way you've comported yourselves in the face of such persistent danger."[13]

91. Police Commissioner Dermot Shea also said that the NYPD "had a plan which was executed nearly flawlessly in the Bronx"[14]. At the same time, the Human Rights Watch ("HRW") issued a report on the NYPD's response to the Mott Haven peaceful protesting finding that NYPD conduct during the Mott Haven protest on June 4 amounts to serious violations of international human rights law including the NYPD's excessive use of force, violations of the rights to free expression and peaceful assembly, arbitrary arrests and detentions, and cruel and degrading treatment of detainees.[15]

---

[12] Amir Vera, *Video Appears to Show NYPD Truck Plowing Through Crowd During Protest*, CNN (May 31, 2020), https://www.cnn.com/2020/05/31/us/nypd-truck-george-floyd-protest/index.html.

[13] Commissioner Dermot Shea (@NYPDShea), TWITTER (May 31, 2020), https://twitter.com/NYPDShea/status/1267074838436425729.

[14] Margaret Garnett, Commissioner, New York City Department of Investigation, *Investigation into NYPD Response to the George Floyd Protests*, ("DOI Report"), Dec. 2020, available at https://www1.nyc.gov/assets/doi/reports/pdf/2020/DOIRpt.NYPD%20Reponse.%20GeorgeFloyd%20Protests.12.18.2020.pdf; New York City Law Department, *Corporation Counsel Report Pursuant to Executive Order 58 (June 20, 2020) Directing an Analysis of Factors Impacting the George Floyd Protests in New York City* (Dec. 2020) ("OCC Report"), https://www1.nyc.gov/assets/law/downloads/pdf/ProtestReport-np.pdf

[15] Human Rights Watch, *"Kettling" Protesters in the Bronx* (Sept 2020) https://www.hrw.org/report/2020/09/30/kettling-protesters-bronx/systemic-police-brutality-and-its-costs-united-states

92. The HRW report found that the NYPD's highest-ranking uniformed officer, Chief of Department Terence Monahan, was present during the action, along with at least 24 other uniformed supervisory officers – chiefs, lieutenants, captains, or inspectors in white shirts.

93. Mayor de Blasio said regarding the Mott Haven operation: "This is something the NYPD saw coming." In response to questioning at the June 5 press conference, Mayor de Blasio further stated: "We had observers for City Hall"[16] present at the NYPD operation in Mott Haven, who reported their accounts back to him, demonstrating the Mayor's advance knowledge of and participation in the planning and execution of the NYPD operation in Mott Haven.

94. Defendants subjected Plaintiff and other peaceful protestors to Defendants' Protest Arrest Processing Policies, whereby Plaintiff was crammed in NYPD vans with many other protestors and NYPD police officers and transported to a precinct or central booking.

95. Defendants did not have individualized probable cause for each arrest or a basis for issuing a summons to Plaintiff.

96. Plaintiff, like many other protestors, was rounded up indiscriminatingly with dozens of other protestors, subject to longer processing times in custody and exposed to dangerous and unsanitary conditions of confinement with no regard to the risk and threat of COVID-19.

97. Due to the sheer number of peaceful protestors that needed to be processed, Plaintiff and other arrestees were subjected to significantly longer processing time in custody, which also exposed them to inappropriate and hazardous conditions of confinement due to COVID-19.

---

[16] Jake Offenhartz, Nick Pinto, and Gwynne Hogan, *"NYPD's Ambush of Peaceful Bronx Protesters Was 'Executed Nearly Flawlessly,' City Leaders Agree,"* Gothamist, June 5, 2020, https://gothamist.com/news/nypds-ambush-of-peaceful-bronx-protesters-was-executed-nearly-flawlessly-city-leaders-agree

### NYPD's Passive Response to Pro-Police and Other Demonstrations

98. On July 11, 2020, a "pro-NYPD rally in Dyker Heights devolved into physical attacks and racist, sexist language used against a group of counter-protesters." [17] A Pro-Police demonstrator punched someone in the groin causing him to seek medical attention. Some pro-police marchers yelled that they hoped protesters would be raped, calling them a c***, and made racist statements like saying Black lives were "garbage." A reporter was shoved by a Blue Lives matter demonstrator and her camera was destroyed, but when the incident was reported to a police officer, they refused to take a police report. Blue Lives matter protestors threatened others with violence and physical assault. The NYPD made no arrests that day. [18]

99. On September 04, 2020, during a Black Lives Matter Protest in Times Square, pro-Trump counter-protestors got into a vehicle and plowed through a crowd of Black Lives Matter marchers, hitting and injuring some of the marchers. The occupants of the vehicle were not arrested. [19]

100.   On December 03, 2020, hundreds of people gathered in Staten Island in support of bar that was shut down because it refused to follow COVID-19 protocols. The Bar operated without a liquor license and served food and drinks in violations of the NYC's orders otherwise. The NYPD did not arrive to the protest in riot gear, did not kettle protestors and did not arrest or issue summonses to anyone during the protest. [20]

---

[17] Pereira, Sydney, *Videos Show Pro-Police Demonstrators in Brooklyn Unleashing Racist, Sexist Vitriol Against Counter* Protestors (July 2020) https://gothamist.com/news/police-rally-back-the-blue-brooklyn-dyker-heights

[18] Id at ¶21.

[19] Id.

[20] Wong, Wilson, NBC News, *Hundreds protest closing of Staten Island bar that refused Covid-19 measures* (Dec 2020) https://www.nbcnews.com/news/us-news/hundreds-protest-closing-staten-island-bar-refused-covid-19-measures-n1249873

**NYPD's Failure to Train Regarding Policing Protests**

101.    Defendant City of New York has failed to train and has inadequately trained officers, including Defendant Officers on how to interact with protestors and police protests without engaging in constitutional violations.

102.    According to the Department of Investigation ("DOI"), the NYPD does not have a policy specific to policing protests or First Amendment-protected expression.[21]

103.    The NYPD relies on the Disorder Control Guidelines ("DCG"), which dictates protocol pertaining to large scale gatherings, civil unrest, disorder control and riots.

104.    The DCG promotes military tactics designed to disperse, deter and demoralize large groups. Upon information and belief, the DCG contains no guidance regarding protest and First amendment activities.

105.    The DOI also found that the NYPD offered no comprehensive in-service training across the Department that related to policing protests at all, and the NYPD lacked standardized, agencywide, in-service training related to policing protests."[22]

106.    In addition to failing to train NYPD officers, the Defendant City deployed the Strategic Response Group ("SRG"), a heavily militarized, rapid-response unit of several hundred officers tasked with dealing with public disorder events and terrorist acts.

---

[21] The City of New York Department of Investigation, *Investigation into NYPD Response to the George Floyd Protests* (December 2020) at 35
https://www1.nyc.gov/assets/doi/reports/pdf/2020/DOIRpt.NYPD%20Reponse.%20GeorgeFloyd%20Protests.12.18.2020.pdf

[22] Ibid.

107.    The SRG are not trained to respond to peaceful protests or First Amendment activity nor is it their purpose. The deployment of SRG to protest and First Amendment activity resulted in the use of violent, aggressive, and excessive force which resulted in constitutional violations.

108.    The DOI also found that "outside of SRG, the NYPD deployed officers who largely lacked any recent training related to protests and that the NYPD appeared to have deployed a large number of front-line supervisors and officers to police the Floyd protests without adequate training. [23]

109.    The DOI further concluded that the new training provided was deficient because "that scenario-based training appears focused solely or primarily on crowd control tactics and formations with no discernable reference to managing interactions, facilitating First Amendment rights, and minimizing the use of force."[24]

110.    Upon information and belief, the NYPD relied upon the DCG and SRG to respond with hostility to protestors as mentioned above and in the documents throughout the reports mentioned herein and cases cited in reference.

111.    Defendants' failure to train includes: (1) failure to ensure the need for individualized probable cause for each arrest; (2) failure to provide training regarding policing protests and First Amendment activities; (3) failure to provide meaningful dispersal orders and opportunities to disperse; and (4) failure to hold officers accountable for misconduct.

---

[23] Id at 66.

[24] Id.

112.    Defendant City's refusal to address the abuses of protestors by Police is the result of a policy, practice, custom, and procedure of the City that encouraged the use of excessive force, false arrest and imprisonment of protestors and to suppress First Amendment-protected activities by using these abusive, militaristic tactics, such as those used against Plaintiff.

113.    The NYPD engaged in a pattern or practice whereby NYPD Officers kettled peaceful protesters, prevented them from leaving an area and stopped them from complying with dispersal orders. The practice involved the use of indiscriminate, excessive force; mass unlawful arrests of peaceful, non-resisting protesters; mass unlawful detention and arrests of protesters who were not given an opportunity to disperse from protest zones; and the overall quashing of peaceful protests.

114.    Defendants, along with other policy-making officials, knew that the NYPD officers were woefully under-trained and were not ready to properly police the mass protests. Despite the foregoing, said Defendants and policy-making officials knowingly and purposefully deployed thousands of insufficiently trained officers to police the protests.

115.    Defendants failed to discipline the vast majority of NYPD Officers who used excessive force against Plaintiff and other Protest attendees.

116.    Out of thousands of complaints of excessive force and abuse of authority received by the CCRB, less than a third are fully investigated leaving the overwhelming majority of officers without accountability.[25]

---

[25] New York City Civilian Complaint Review Board, *Complaints* (Accessed October 13, 2021) https://www1.nyc.gov/site/ccrb/policy/data-transparency-initiative-complaints.page#complaint_fado

117.    Furthermore, the DOI report found that between May 28 and June 20, 2020, the CCRB had received 1,646 protest-related allegations related to 248 incidents.[26]

118.    Upon information and belief, Mayor de Blasio and Commissioner Shea received regular reports from Chief Monahan, City Hall Observers and other NYPD officials regarding the manner in which the City responded to the mass protests and confirmed the same during press conferences held throughout the years 2020 and 2021.

119.    Upon information and belief, Mayor de Blasio, Commissioner Shea, and Chief Monahan regularly reviewed reports documenting patterns of police misconduct, their use of excessive force, unlawful seizures, and other First-Amendment violations, including media coverage regarding the violent suppression of peaceful protestors.

120.    Despite being aware of the unlawful practices of the NYPD in policing the protests, named Defendants Mayor, Commissioner Shea, Chief Monahan and the NYPD leadership deliberately failed to correct and/or prevent NYPD Officers from using the aforementioned tactics.

**NYPD'S Practice of Unlawful Arrest**

121.    Defendants effectuated, condoned and enforced a pattern or practice whereby NYPD Officers surrounded peaceful protestors, blocked them from leaving, and prevented them from complying with dispersal orders through the use of indiscriminate excessive force.

122.    Defendants effectuated, condoned and enforced a pattern or practice whereby NYPD Officers engaged in the unlawful mass arrests of peaceful protestors, and unlawful mass detentions and arrests of protestors who were not given an opportunity to disperse.

---

[26] Id.

123.    Defendants effectuated, condoned and enforced a pattern or practice whereby NYPD Officers submitted false documents in support of the criminal prosecutions of protestors and did so to cover for their use of force and the unlawful arrest.

124.    Indeed, this was a practice, custom and policy employed by the NYPD in response to protest well before the case at hand. The First Amended Complaint in *People of the State of New York v. City of New York, et al.*, 21-cv-0322 (CM) (GWG), paragraphs 24-35, which are incorporated by reference into this complaint, detailed the lawsuits and findings of the CCRB and NYPD Office of the Inspector General, detailing the NYPD's history use of excessive force, kettling, training deficiencies, failure to discipline and even beyond that- an effort made to cover up police misconduct at protest.

125.    The NYPD met protests following the start of the Iraq War in 2003 with mass arrests, excessive force, use of pepper spray, riding horses into crowds and batons strikes to disperse protestors, and kettling to move protestors from specific locations to effectuate mass arrests.[27]The New York Civil Liberties Union ("NYCLU") documented the NYPD's use of mass arrests at protests of the 2004 Republican National Convention ("RNC") in New York City. This resulted in over 200 complaints from protestors detailing the unlawful mass arrests of peaceful protestors and surveillance of demonstrators.

126.    As Deputy Chief of the Department. Defendant Monahan orchestrated an NYPD operation to kettle a large group of peaceful protesters present at the RNC protests, and then ordered their arrests. Then-District Judge Richard Sullivan, now a Circuit Court Judge of the Second Circuit Court of Appeals, concluded that defendant Monahan's actions were unconstitutional. A trial

---

[27] See, e.g., N.Y. Civil Liberties Union, *Arresting Protest* (2003) https://www.nyclu.org/sites/default/files/nyclu_arresting_protest.pdf. See also *People of the State of New York v. City of New York et al.*, 21-cv-0322, Dkt. No. 1 at ¶ 26 (S.D.N.Y.).

jury found Monahan liable for $25,000 in punitive damages for his intentional and malicious conduct. *Abdell v. City of New York*, No. 05 Civ. 8453 (RJS) (S.D.N.Y.), Judgment at Dkt. 432.

127.    Similarly, during the Occupy Wall Street ("OWS") protests in 2011, the NYPD used excessive force against protestors, bystanders, and National Lawyers Guild – New York City Chapter Legal Observers, as well as kettling tactics to move protestors or initiate mass arrests.

128.    The Civilian Complaint Review Board ("CCRB"), an independent agency that undertakes oversight of the NYPD, substantiated an astonishing number of complaints of excessive force between 2013 and 2019, including: "471 allegations of excessive force during this period against NYPD Officers who were still employed with the agency as of June 2020."[28]

129.    Defendants were each and all responsible, in whole and/or in part, for the planning for and/or creation, promulgation, implementation, and/or enforcement of the unconstitutional policies, practices and/or customs complained of herein, and/or condoned, acquiesced in, adopted, and/or approved of the same, through their acts and/or failures to act, as set forth more fully below.

130.    In many of these cases Defendants employed tactics developed and modified over the course of many years by Defendants Shea, Monahan, and their predecessors and by other defendant City policymakers at and in connection with other demonstrations in the City dating back to around 2000 and continuing through the present, including the policies, practices, and customs complained of herein, and also described and litigated in the following cases:

---

[28] *People of the State of New York v. City of New York, et al.*, 21-cv-0322 (CM) (GWG) – First Amended Complaint (Dkt No. 51) at ¶34.

a.  *Haus v. City of New York,* 03-cv-4915 (RWS)(MHD) 2006 WL 1148680, *1 (S.D.N.Y. April 24, 2006) (class action challenging arrests, detentions, and prosecutions of around 300 people in connection with February 15, 2003 anti-war protests, alleging that arrests were made without probable cause and pursuant to Department directive to "engage in pre-emptive mass arrests and to subject arrestees to delayed and arduous post-arrest processing." See also *Larsen v. City of New York, et al.*, 04-cv-0665 (RWS) (S.D.N.Y.);

b.  *Kunstler v. City of New York*, 04-cv-1145 (RWS)(MHD) (S.D.N.Y.) and other related cases arising from alleged false and retaliatory arrests in connection with police responses to protests on April 7, 2003, raising *Monell* and other claims similar and related to the policies and practices complained of herein such as encircling protesters, striking them with nightsticks, and using extremely tight plastic handcuffs in their arrest;

c.  *MacNamara v. City of New York*, 04-cv-9216 (RJS)(JCF) (S.D.N.Y.) (including the Second Amended Class Action Complaint, Dkt. No. 200-2), *Abdell. v. City of New York*, 05-cv-8453 (RJS)(JCF) (S.D.N.Y.), *Schiller. v. City of New York*, 04-cv-7922 (RJS) (JCF) (S.D.N.Y.), *Dinler v. City of New York*, 04-cv-7921 (RJS)(JCS) (S.D.N.Y.), *Kyne v. Wolfowitz,* 06-cv-2041 (RJS)(JCF) (S.D.N.Y.) (including the Second Amended Complaint, Dkt. No. 18), and the dozens of other cases consolidated for discovery purposes in the S.D.N.Y. arising from arrests made, and policies related to, the RNC in New York City in 2004. *See, e.g., Schiller*, No. 04-cv-7922 (RJS)(JCF), 2008 WL 200021 at *2-5 (S.D.N.Y. Jan. 23, 2008) (noting the City's consent to amendment of complaints in RNC cases to add, *inter alia*, "constitutional challenges to the defendants' alleged practice of detaining . . . all persons in connection with the RNC . . . no matter how minor the infraction, rather than issuing summonses on the street"); *MacNamara v. City of New York,* 275 F.R.D. 125, 154

(S.D.N.Y. 2011) (certifying six "mass arrest subclasses" as well as an "Excessive Detention Class" comprised of all RNC arrestees who were processed pursuant to the RNC Mass Arrest Processing Plan and a "Conditions of Confinement Class, comprising all RNC arrestees who were handcuffed with plastic flex cuffs[.]"); *Dinler*, No. 04-cv-7921 (RJS)(JCF), 2012 WL 4513352, at *13-15 (S.D.N.Y. Sept. 30, 2012) (granting plaintiffs' motions for summary judgment on their false arrest claims related to hundreds of people mass arrested at 2004 RNC in connection with a War Resisters League march and denying defendants' cross-motion on false arrest claims);

c.   In *Peat v. City of New York,* No. 12-cv-08230 (S.D.N.Y.), fifteen OWS plaintiffs arrested on January 1, 2012, on the sidewalk in the East Village settled a case with Defendant City of New York for $598,000. The settled complaint alleged that plaintiffs were peacefully and lawfully protesting when executive members of the NYPD blocked their path on the sidewalk,34 encircled them on three sides and a building line on the fourth side. The NYPD made dispersal announcements without providing sufficient time or a path of egress as members of the scooter task force blocked the protesters path of egress;

131.   In *Payne v. de Blasio*, 20 Civ. 8924 (CM)(GWG) (S.D.N.Y.), filed by the New York Civil Liberties Union and The Legal Aid Society, plaintiffs therein describe the same NYPD operations and others with the same general tactics as those deployed in the protests delineated above. The Mayor of New York and the NYPD's leadership condoned and even promoted that violence. . . . These attacks . . . were undertaken in retaliation for the protesters' message — calling for greater police accountability, a reallocation of funding from away from police departments and into Black and Latinx communities, the end of police brutality, and a recognition that Black Lives Matter. *Payne* Complaint ¶¶ 1, 3, 35-60.

132.    The New York Attorney General filed *People of the State of New York v. City of New York*, 21 Civ. 322 (CM)(GWG) (S.D.N.Y.), which describes the violent history, beginning in the early 2000's, of NYPD policing of protest activity. This includes application of "disorder control" methods without due regard for the First Amendment rights of protesters. It also presents graphic evidence of the widespread use of police violence against the George Floyd/Black Lives Matter protesters – violence far in excess of what took place at the largescale protests of earlier years.

133.    According to the DOI, NYPD's use of force on protesters—encirclement (commonly called "kettling"), mass arrests, baton and pepper spray use, and other tactics—reflected a failure to calibrate an appropriate balance between valid public safety or officer safety interests and the rights of protesters to assemble and express their views.[29]

134.    The NYPD did not have adequate policy or failed to train its members on policing protest and instead relied upon Disorder Control Guideline. The Disorder Control relies on the use of mass arrests… and other tactics to enforce crowd control. [30]

135.    The NYPD's use of mass arrest resulted in multiple arrest of protestors, including Plaintiff, without particularized and individualized probable cause pertaining to each arrest.

136.    The NYPD purposefully and repeatedly used tactics, such as kettling, to effectuate the unlawful arrests, and intentionally created barriers and difficulties for the peaceful protestors that sought to comply with the NYPD's dispersal orders.

137.    In numerous instances, all well documented by media, officers were seen flanking protestors, blocking their paths with bicycles, and vehicles, to prevent protestors from leaving.

---

[29] DOI Report at 3

[30] Id at 35

## AS FOR THE FIRT CAUSE OF ACTION

## EXCESSIVE FORCE/UNLAWFUL USE OF FORCE
## UNDER  42 U.S.C. § 1983

138.    Plaintiff repeats, reiterates and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

139.    All of the aforementioned acts of the Defendant CITY OF NEW YORK, and the individual Defendants and their agents, servants and employees, were carried out under the color of state law.

140.    Upon information and belief, each Defendant, intentionally and/or recklessly used and attempted to use unreasonable, unlawful and/or excessive force on Plaintiff, including but not limited to, striking, beating, dragging, hitting, sitting on and pushing Plaintiff, thereby depriving Plaintiff of her right to be free from assault, battery, the use of unreasonable, unlawful, excessive, and improper force in violation of the Fourth and Fourteenth Amendments of the Constitution of the United States, 42 U.S.C. § 1983, NYS Constitution, New York State laws, and the common laws of New York.

141.    The aforementioned individual Defendants in their official capacities as Police Officers carried out the acts complained of, with all of the actual and/or apparent authority attendant thereto.

142.    Defendants' actions were without any legal justification, and the force used upon Plaintiff was excessive, unwarranted, inappropriate, reckless, negligent and wholly improper.

143.    Defendants' use of force against Plaintiff was not justified as she posed no threat to the Defendants that required the use of force used against her and was lawfully present at all locations mentioned above.

144.    Defendants' actions caused Plaintiff to fear for her life and safety, and at no point was any of the contact and attempted contact consensual or privileged.

145.    As a direct and proximate result of the above constitutionally impermissible conduct, Plaintiff was subject to unlawful excessive force, assaulted, seized and was caused to suffer personal injuries, violation of her civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom.

146.    As a result of Defendants' impermissible conduct, Plaintiff demands judgment against Defendants in a sum of money to be determined at trial.

### AS A SECOND CAUSE OF ACTION

**FALSE ARREST, FALSE IMPRISONMENT, UNLAWFUL SEIZURE
UNDER 42 U.S.C. § 1983 AND NYS LAW**

147.    Plaintiff repeats, reiterates and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

148.    That on the above-mentioned dates, the Defendants, and their agents, servants and/or employees intentionally handcuffed, arrested and imprisoned Plaintiff, without any just cause or individualized probable cause.

149.    The Defendants, their agents, servants and/or employees, as set forth above, intended to seize, handcuffed and arrest Plaintiff against her will; Plaintiff was conscious of her arrests and confinements; did not consent to the arrests and confinements; and the arrests and confinements were not otherwise privileged.

150.    As a direct and proximate result of the above constitutionally impermissible conduct, Plaintiff was caused to suffer personal injuries, violation of her civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom.

151.   As a result of Defendants' impermissible conduct, Plaintiff demands judgment against Defendants in a sum of money to be determined at trial.

## AS A THIRD CAUSE OF ACTION

### FAILURE TO INTERVENE UNDER 42 U.S.C. §1983

152.   Plaintiff repeats, reiterates and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

153.   The Defendants collectively had an affirmative duty to intervene on Plaintiff's behalf to prevent the violation of her constitutional rights. Each of the Defendant-Officers engaged in the use of excessive force and assault of the Plaintiff.

154.   While each Defendant-Officer was engaged in the use of excessive force, surveillance, targeting, assault, harassment of Plaintiff in violation of her rights, those officers who were not engaged in said conduct against Plaintiff failed to intervene to prevent the use of excessive force in violation of Plaintiff's rights, despite an opportunity to do so.

155.   The Defendant-Officers watched as Plaintiff was unlawfully subjected to excessive, unnecessary and unlawful force, and falsely arrested. Defendant Officers participated in the harassment, intimidation, targeting, assault, surveillance and false arrest of Plaintiff. Defendants mocked, laughed and were entertained by the humiliation and degradation of Plaintiff. Defendants also participation in the violation of Plaintiff's constitutional right to assemble and exercise free speech.

156.   Each Defendant had an opportunity to intervene to stop the false arrest and stop the use of excessive, unnecessary and unlawful force deployed against Plaintiff in front of them and within their immediate area. Each Defendant failed to instruct other officers not to use force or physically restrain the officers from using force and not to engage in the false arrest of Plaintiff.

To the contrary, officers were encouraged to threaten, harass, intimidate, arrest, surveille Plaintiff and chill her speech.

157.   The Defendants collectively failed to intervene on Plaintiff's behalf in order to prevent the violation of her constitutional rights despite having substantially contributed to the circumstances within which the Plaintiff's rights were violated by their affirmative conduct.

158.   As a direct and proximate result of the above constitutionally impermissible conduct, Plaintiff was caused to suffer personal injuries, violation of her civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom.

159.   As a result of Defendants' impermissible conduct, Plaintiff demands judgment against Defendants in a sum of money to be determined at trial.

## AS A FOURTH CAUSE OF ACTION

### ASSAULT AND BATTERY UNDER NEW YORK STATE LAW

160.   Plaintiff repeats, reiterates and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

161.   Among other things as described above, Defendants' search, seizure, and use of force against Plaintiff placed her in fear of imminent harmful and offensive physical contacts.

162.   Defendants used unlawful force upon Plaintiff, including striking her with such force that in one instance she suffered a fractured arm.

163.   Among other things as described above, Defendants' search, seizure, surveillance, harassment, targeting and use of force against Plaintiff were illegal physical contacts and served to intimidate, harass and prevent her from exercising her constitutional rights under the first amendment.

164. As a direct and proximate result of the above constitutionally impermissible conduct, Plaintiff was caused to suffer personal injuries, violation of her civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom.

165. As a result of Defendants' impermissible conduct, Plaintiff demands judgment against Defendants in a sum of money to be determined at trial.

### AS A FIFTH CAUSE OF ACTION

**MUNICIPAL LIABILITY**
**Pursuant to 42 U.S.C. 1983 and Monell v. Department of Social Services, 436 U.S. 658 (1978) for Defendants' Violations of Plaintiffs' Rights Under the First, Fourth, and Fourteenth Amendments to the United States Constitution and *respondeat superior* against Defendant City of New York, Defendant Bill de Blasio, Defendant Dermot Shea, and Defendant Terence Monahan**

166. Plaintiff repeats, reiterates and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

167. At all relevant times, the individual Defendant-Officers were acting as the agents, servants and employees of Defendant City.

168. At all relevant times, the Defendant City maintained the NYPD which acts under the direction and supervision of the aforementioned municipal corporation, City of New York.

169. Defendant City of New York, therefore, directly or indirectly, and under color of law, thereby approved or ratified the unlawful, malicious and wanton conduct of the individual Defendant police officers named herein.

170. The individual Defendants were acting within the scope of their employment as New York City Police Officers, and invoked state power and authority when committing the above-described acts against Plaintiff. As a result, the Defendant City is liable to Plaintiff pursuant to the state common law doctrine of *respondeat superior.*

34

171.     Defendant City of New York failed to use reasonable care in the selection of its employees, against and/or servants, failed to properly train and/or supervise the individual Defendants, and failed to provide the appropriate safeguards to prevent the excessive force, assault, harassment, negligence, false arrest, intimidation, surveillance and collective violation of the Plaintiff's rights.

172.     Defendants failed to adequately train and supervise the NYPD Officers who assaulted, battered, falsely arrested, intimidated, surveilled, falsely imprisoned, and/or negligently injured Plaintiff.

173.     Defendant City of New York and NYPD acted under color of law pursuant to an official policy, practiced or custom and practice of the Defendant City of New York and NYPD and intentionally, knowingly, recklessly or with deliberate indifference failed to properly and adequately control and discipline on a continuing basis its employees, agents and/or servants and/or otherwise failed to prevent the individual defendants from unlawfully and maliciously conducting, permitting or allowing the Constitutional violations alleged above in violation of the rights, privileges and immunities guaranteed to Plaintiff by the Constitution and laws of the United States and/or New York.

174.     Defendant City of New York and NYPD had knowledge of, or had they diligently and reasonably exercised their duties to instruct, supervise, control, monitor and discipline its employees, agents and/or servants, would have had knowledge of the wrongful acts and/or omissions identified above and intentionally, knowingly or with deliberate indifference to Plaintiff's rights, failed or refused to prevent their commission and/or omission.

175.   The City failed to train its officers on how to facilitate protesters exercising their constitutional rights, particularly as it relates to policing protests, and to not use force upon them or unlawfully discourage same.

176.   The City of New York also failed to train its officers that if they see other officers engaged in misconduct/unlawful activity, such as the unlawful use of force and inhibiting the exercise of free speech, protest, and assembly in this matter, they must intervene to prevent it.

177.   As a direct and proximate result of the above constitutionally impermissible conduct, Plaintiff was caused to suffer personal injuries, violation of her civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom.

178.   The practice involved the use of indiscriminate, excessive force; mass unlawful arrests of peaceful, non-resisting protesters; mass unlawful detention and arrests of protesters who were not given an opportunity to disperse from protest zones; and the overall quashing of peaceful protests.   The City was on notice that its officers have continually violated the rights of protesters, yet has done nothing to hold any officer accountable, impose any training, and instead encouraged officers to continue to use unlawful tactics such as the ones described herein, with the explicit goal of violating Plaintiff's rights and the exercise of same.

179.   Defendants were acting within the scope of their employment as officers on duty and in uniform, for the City of New York when the committed the above actions.

180.   The Defendants were acting pursuant to the City's mandates and for its benefit when the committed the above actions. Defendant City of New York, as the employer of NYPD Officers, is responsible for the wrongdoing of NYPD Officers under the doctrine of respondeat superior

181.   As a result of Defendants' impermissible conduct, Plaintiff demands judgment against Defendants in a sum of money to be determined at trial.

## AS A SIXTH CAUSE OF ACTION

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

182.   Plaintiff repeats, reiterates and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

183.   The actions of the collective Defendants heretofore described, constituted unlawful detention, imprisonment, assault and battery and were designed to and did cause bodily harm, pain and suffering both in violation of Plaintiff's Constitutional rights as guaranteed under 42 U.S.C. §1983 and the United States Constitution, Fourth and Fourteenth Amendments and the Constitution of the State of New York.

184.   Collective Defendants' actions were undertaken under color of law and would not have existed but for Defendants using their official power.

185.   Defendants' conduct was extreme and outrageous in that Defendants intentionally followed, surveilled, targeted, intimidated, harassed and singled out Plaintiff. Defendants made an effort to inform Plaintiff they were watching her in some manner, every officer knew who she was, had her picture, watched her social media activity and knew what protests she would attend.

186.   Defendants' conduct was extreme and outrageous in that Plaintiff was consistently singled out in protests, assaulted, falsely arrested and falsely charged with crimes that were dismissed.

187.   Defendants acted with intent to cause, or disregard of a substantial probability of causing, severe emotional distress to Plaintiff.

188.   As a direct and proximate result of the above constitutionally impermissible conduct, Plaintiff was caused to suffer personal injuries, violation of her civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom.

189.    As a result of Defendants' unlawful conduct, Plaintiff demands judgment against Defendants in a sum of money to be determined at trial.

## AS AN SEVENTH CAUSE OF ACTION

### MALICIOUS PROSECUTION UNDER 42 U.S. C. § 1983 AND NEW YORK STATE LAW

190.    Plaintiff repeats, reiterates and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

191.    Upon information and belief, Defendants falsified police reports, arrest paperwork, sworn statements, criminal summonses and submissions to the District Attorney's office in support of the malicious prosecution of Plaintiff.

192.    Defendants lacked probable cause to initiate and continue criminal proceedings against Plaintiff and Defendants acted with malice in initiating criminal proceedings against Plaintiff.

193.    The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

194.    The criminal proceedings initiated against Plaintiff were resolved in her favor in that they were dismissed.

195.    As a direct and proximate result of Defendants acts and omissions, Plaintiff was caused to suffer personal injuries, violation of her civil rights, emotional distress, anguish, anxiety, fear, humiliation, caused to expend costs and expenses and suffered loss of freedom.

196.    As a result of Defendants' impermissible conduct, Plaintiff demands judgment against Defendants in a sum of money to be determined at trial.

## AS AN EIGHTH CAUSE OF ACTION

### VIOLATION OF FREE SPEECH, FREEDOM OF ASSEMBLY, AND RETALIATION Pursuant to 42 U.S.C. § 1983 under the first and Fourteenth Amendments of the U.S. Constitution and NYS Constitution

197.    Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

198.    Defendant NYPD Officers violated the constitutionally-protected activities of speech, assembly and expressive conduct and retaliated against Plaintiff having engaged in said activities by assaulting, battering, detaining and falsely charging her.

199.    Defendants engaged in the acts and omissions complained of herein in retaliation for Plaintiff's protected speech and/or conduct.

200.    Defendants engaged in the acts and omissions complained of herein in order to prevent Plaintiffs from continuing to engage in such protected speech and/or conduct.

201.    The NYPD's unconstitutional abuses and violations were, and are, directly and proximately caused by policies, practices and/or customs devised, implemented, enforced, encouraged and sanctioned by Defendant City, Shea and/or Monahan.

202.    Defendants sanctioned, encouraged and implemented policies and practices, practices, and/or customs of punishing conduct of protest attendees protected by the First Amendment in retaliation for, and in order to prevent Plaintiff from further, exercising those rights, as detailed above.

203.    Defendants have repeatedly had notice that NYPD Officers' training and supervision were inadequate and likely to result in constitutional violations based on complaints of First Amendment violations at large-scale protests within the last two decades, as documented in reports, lawsuits, and CCRB complaints.

204.    Defendants have acted with deliberate indifference to the First Amendment rights of New York Residents, particularly Plaintiff. Defendants' acts and omissions have directly and proximately chilled and thus violated the First Amendment Rights of Plaintiff. By acting under

the color of state law to deprive Plaintiff of her rights under the First Amendment, Defendants violated 42 U.S.C. § 1983, which prohibits the deprivation under color of state law of those rights secured by the United States Constitution.

205.   Upon information and belief, Defendants did not subject other protesters expressing "pro police views or other, messages who were similarly situated to Plaintiff in terms of their conduct and/or its potential public ramifications to the conduct, policies, practices, and/or customs complained of herein.

206.   Additionally, the offenses charged against Plaintiffs were all offenses that Defendants typically exercise their discretion not to enforce, or not to make arrests in connection with.

207.   Furthermore, Defendants targeted, surveilled and intimidated Plaintiff when she was not participating in protests and Plaintiff suffered adverse effects on her protected speech.

208.    Defendant NYPD Officers were acting within the scope of their employment, were acting as the agents, servants and employees of Defendant City of New York, as the employer of the NYPD officers and therefore Defendant City of New York, as the employer of NYPD Officers, is responsible for the wrongdoing of NYPD Officers under the doctrine of respondeat superior.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38 Plaintiff demands a trial by jury in this action for all issues triable by a jury.

## RELIEF REQUESTED

**WHEREFORE,** Plaintiff demands that judgment be entered against the Defendants, jointly and severally, for:

(a) any and all damages sustained by the Plaintiff arising from the foregoing wrongful and unlawful acts of the Defendants;

(b) punitive damages against the individual Defendant-Officers where permissible by law;

(c) interest, both pre-judgment and post-judgment;

(d) a declaration that Defendant's violated the rights of Plaintiff;

(e) an Injunction/Order prohibiting the Defendants from violating the rights of protesters, and

amending their policies to inhibit the violation of rights as alleged herein;

(f) attorney's fees and costs; and

(g) all other such relief as this Court may deem appropriate, equitable, and just

Dated: New York, New York
        June 02, 2022

Respectfully Submitted,
The Aboushi Law Firm, PLLC
_____/s/_____
By: Tahanie A. Aboushi
*Attorneys for Plaintiff*
1441 Broadway, Fifth Floor
New York, New York 10018
Telephone: (212) 391-8500
Facsimile: (212) 391-8508
Tahanie@Aboushi.com